UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:15-cr-000231-GEB-1 |
|---|---|
| Plaintiff, | |
| v. | **ORDER ON DEFENDANT'S OBJECTION TO OMISSION IN THE PRESENTENCE REPORT OF DOWNWARD DEPARTURE UNDER U.S.S.G. § 5K2.13** |
| KULWANT SINGH SANDHU, | |
| Defendant. | |

Defendant Kulwant Singh Sandhu ("Defendant" or "Sandhu") objects to what is essentially paragraph 92 in the Presentence Report (the "PSR"), arguing that the Probation Officer should not have denied his request for a departure downward for diminished mental capacity under the United States Sentencing Commission Guidelines Manual ("U.S.S.G.") § 5K2.13.

Defendant argues he is entitled to a downward departure from the advisory guideline imprisonment range under U.S.S.G. § 5K2.13 based on his diminished mental capacity. The Probation Officer states in paragraph 92 of the PSR: "The probation officer has not identified any factors that would warrant a departure from the applicable guidelines." Presentence Report ("PSR") 19 ¶92, ECF No. 94. Defendant argues, inter alia:

> The FBI interview, the recorded voice mail messages, the interview with probation, and the evaluation by Dr. Weber all establish that Mr. Sandhu has a serious obsession with perceived fraud in the financial sector. Mr.

1

Sandhu adamantly believes that he uncovered a fraud related to Netflix and that the fraud was going to topple the economy, causing the loss of homes, pensions, and jobs. Although his beliefs are based on objective facts, the extent of the fraud, the urgency of it, and Mr. Sandhu's belief in his special ability to "prove" such fraud are delusions. See Psych. Rpt. (Dkt. 94-5) at 6-7. As is evident to anyone who speaks with Mr. Sandhu about the subject, he cannot be talked out of his beliefs.

These immovable beliefs drove his behavior beyond the point of rationality. He did not merely inform [t]he authorities; he made many calls. He did not merely warn in mundane terms; he employed wild exaggeration to show how serious he thought the fraud was. For example, he says that he himself should be hanged if he is proven wrong about the Netflix stock manipulation fraud. See, e.g., Exh. 22 at 1:18-19 (transcript of voicemail for Bruce McLean) ("I am willing to sign my death warrant, that if I am wrong, then hang me.").

This delusional belief system constitutes a significantly reduced mental capacity within the meaning of § 5K2.13, because his obsession and rigid delusions reduced his ability to understand the wrongfulness of the volume of calls and of the language he used in the voicemails. See Psych. Rpt. at 7-8. In Mr. Sandhu's version of reality, the repeated calls and strong language were necessary to avert financial disaster for millions of innocent Americans. Such thinking clouded his ability to understand the wrongfulness of his behavior.

To the limited extent Mr. Sandhu could recognize the wrongfulness of his behavior, Mr. Sandhu's reduced mental capacity also interfered with his ability to control his behavior. See Psych. Rpt. at 7-8. His beliefs so colored his view of reality that every day he thought another financial crisis was imminent. He believed he had a duty to alert the authorities to the daily developments in the financial industry that he saw as further evidence of dangerous and widespread fraud. These circumstances impaired his ability to control his obsessive and urgent communication with the regulatory

2

| | agencies . . . . |
| --- | --- |
| | A departure for significantly reduced mental capacity is warranted. |

Def.'s Formal Obj. to PSR ("Def.'s Obj.") 17:17-18:16, :20, ECF No. 97.

The United States counters Defendant's objection, arguing:

> [Defendant] claims a probationary sentence is appropriate because he will be capable of controlling himself, yet claims a persistent delusion of an "imminent" ongoing crisis to which he will continue to respond with extreme behavior . . . . [O]ver his years of harassing conduct, the defendant has displayed a clear ability to make reasoned judgments when necessary, demonstrating that he is not suffering from a significantly reduced mental capacity sufficient to warrant a § 5K2.13 departure . . . .
>
> Here, the defendant's deliberate selection of foul and profane language — whether to harass or merely to "get attention," as he contends — his ability to skirt the conditions of his prior diversionary period, and, now, his halting his harassment campaign when facing severe consequences, all suggest a wholly intact ability to form reasoned judgments . . . .
>
> . . . .
>
> Contrary to what the defendant's hired expert says, the defendant's behavior is consistent with that of an angry person who is capable of controlling himself, as found by Dr. Martin. Indeed, even his own counsel believe[s] he can control his behavior. At sentencing, the defendant's counsel argued emphatically that the defendant should not be remanded given his history of complying with rules, focusing on the fact that the defendant had control over his issues . . . .
>
> And now the defendant, in his objections, argues . . . that a probationary sentence with proper counselling included will be sufficient to prevent further harassment. He cannot have it both ways.

> The Probation Officer's inclusion of the conflicting mental health evaluations was proper. Her finding Dr. Weber's assertion of a delusional disorder sufficient to warrant a departure unpersuasive, set against the backdrop of Dr. Martin's more informed diagnosis and the totality of this case, is entirely appropriate and the defendant's contention that he merits a downward departure for mental health reasons under §5K2.13 should be rejected.

Gov't Opp'n to Def.'s Obj. ("Gov't Opp'n") 13:15-17, 14:10-12, :20-23, 15:12-16, 16:13-19, ECF No. 100 (citations omitted). The Probation Officer discusses Dr. Martin in paragraph 62 of the PSR as follows:

> This [probation] officer telephonically contacted Dr. Martin to verify Sandhu's participation. He confirmed he is working with Sandhu on controlling his anger, how to take ownership for his actions, and how not to become obsessed over matters where it causes him to lose sight, become irrational, and/or become involved in illegal behavior. Dr. Martin reported that the defendant was very angry when he first met him. Dr. Martin recalled Sandhu asking him to write him a letter addressed to his pretrial officer stating he did not need counseling. Dr. Martin refused and scheduled a second appointment. On his second visit, Sandhu informed Dr. Martin that his attorney thinks he is delusional and wants to talk to Dr. Martin about this. Dr. Martin recalled Sandhu not believing he was delusional as his attorney believed him to be . . . Since these initial appointments, Dr. Martin indicated the defendant has been "calm" during sessions and "appears to be listening" to what is being discussed between them.

PSR 14-15 ¶62. Sandhu argues his "delusional belief system constitutes a significantly reduced mental capacity within the meaning of § 5K2.13, because his obsession and rigid delusions reduced his ability to understand the wrongfulness of the volume of calls and of the language he used in the voicemails." Def.'s

4

Obj., 18:4-7.

> U.S.S.G. § 5K2.13 prescribes:
>
> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

The Ninth Circuit discusses types of mental disorder which can support downward departure based on significantly reduced mental capacity in United States v. Cantu, 12 F.3d 1506, 1511-1513, 1515 (9th Cir. 1993) (emphasis in original) (citations and quotations omitted), as follows:

> In everyday language, "reduced mental capacity" refers to a lack of full intellectual functioning. It connotes an impairment of the intellect, a failure to be able quickly or fully to grasp ordinary concepts. We have treated § 5K2.13 as applying to emotional conditions as well.
>
> . . . .
>
> Treating emotional illnesses in the same way that we do mental abnormalities furthers the purpose of § 5K2.13. The goal of the guideline is lenity toward defendants whose ability to make reasoned decisions is impaired. Emotional conditions, like mental impairments, may distort or suppress the formation of reasoned decisions. The focus of the guideline provision is reduced mental *capacity*, not the cause-organic, behavioral, or both-of the reduction.
>
> . . . .
>
> . . . [A] defendant suffering from . . . an emotional illness, is eligible for such a departure if his ailment distorted his reasoning and interfered with his ability to make considered decisions.

> . . . [A] defendant may be eligible for a departure under § 5K2.13 no matter what the nature or severity of his underlying condition. The guideline provision requires *only* that the defendant suffer from a significantly reduced mental *capacity*. It concerns the *effect* of the impairment on the defendant, not the characteristics or the seriousness of the impairment itself.
>
> . . . .
>
> Section 5K2.13 requires that the offender's significantly reduced mental capacity have contributed to the commission of the crime[; meaning] the disorder need be only a contributing cause, not a but-for cause or a sole cause, of the offense . . . . That is, it requires only that the district court find *some* degree, not a *particular* degree, of causation . . . . Thus, the degree to which the impairment contributed to the commission of the offense does not constitute the degree to which the defendant *is eligible for* the departure. The defendant's eligibility remains the same whether his impairment contributed greatly to the commission of his offense, or hardly at all.

The record reveals that Sandhu had distorted reasoning when he engaged in the felonious conduct involved in his convictions. Therefore, his objection to the departure paragraph in the PSR is sustained.

The policy statement in U.S.S.G. § 5K2.13 states "the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." The degree to which Sandhu's distorted reasoning contributed to the commission of his offenses is unclear. The Ninth Circuit states in <u>Cantu</u> that "[t]he court's [departure] decision must be precise and fact-specific and must take into account any treatment the defendant is receiving or will receive while under sentence, the likelihood that such treatment will

6

prevent the defendant from committing further crimes, the defendant's likely circumstances upon release from custody or its alternatives, the defendant's overall record, and the nature and circumstances of the offense that brings the defendant before the sentencing court." Cantu, 12 F.3d at 1516. The Ninth Circuit also states in Cantu "the degree to which the impairment contributed to the commission of the offense constitutes the degree to which the defendant's punishment should be reduced." Id. at 1515. Sandhu has had and continues having, as of the date the PSR was written, counseling sessions with mental health therapist Dr. Martin concerning the following: Sandhu's ability to control his anger, to take ownership for his actions, and to discontinue becoming obsessed over matters that cause him to become irrational, and/or become involved in illegal behavior. PSR 14 ¶62. Dr. Martin reported to the Probation Officer Sandhu "was very angry when he first met him," but has become "calm" over the course of several therapy sessions and "appears to be listening" to what they discussed. PSR 14-15 ¶62. It is apparent that Sandhu suffers from some type of disorder that "distorted his reasoning and interfered with his ability to make considered decisions" involved in his felonious conduct. Cantu, 12 F.3d at 1513. However, Sandhu's demeanor during the trial, his apparent post trial behavior, and his behavior during most of the time he was involved in his earlier harassment case, evinces that Sandhu has the ability to stymie his penchant for harassing victims by causing their telephones to repeatedly ring and by subjecting them to outrageously threatening, aggressive, and vulgar language.

"Resolution of disputed facts concerning [the] mental impairment [at issue] requires more than simply a neutral process. The court's inquiry into the defendant's mental condition and the circumstances of the offense must be undertaken with a view to lenity, as section 5K2.13 implicitly recommends. Lenity is appropriate because the purpose of § 5K2.13 is to treat with some compassion those in whom a reduced mental capacity has contributed to the commission of a crime." Cantu, 12 F.3d at 1511 (citation and quotations omitted). "The purpose of this departure is lenity, not harshness, toward those who are mentally or emotionally disabled." Id. at 1516.

Plainly, Sandhu's distorted reasoning contributed in some degree to the commission of his crimes. The federal sentencing factors under 18 U.S.C. § 3553 are considered in a different light when determining the extent of the departure.

> [T]wo of the primary rationales for punishing an individual by incarceration - desert and deterrence - lose some of their relevance when applied to those with reduced mental capacity [or with distorted reasoning]. Desert (blameworthiness) loses some bite because those with reduced ability to reason, or to control their impulses, are less deserving of punishment than those who act out of viciousness or greed. Deterrence has less value as a rationale for punishment because people with reduced capacities are less susceptible to a system of punishment and reward: the grip of their disorders may make them less able both to identify and to conform their actions to an appropriate course of conduct. Incapacitation alone retains its full force against such offenders. They are as capable of inflicting harm as those who are not disabled, and their mental conditions may make them less susceptible to deterrence.
>
> When defendants with reduced mental capacity [or with distorted reasoning] do not

|   |   |
|---|---|
| 1 | exhibit violent conduct, however, incapacitation is not such an important goal. |
| 2 | Read as a whole, the guideline states that "when incapacitation is not an important |
| 3 | justification for punishment, [a] mental condition may be the basis of a departure." |
| 4 | In essence, the guideline asks a sentencing court to determine whether public safety |
| 5 | requires that the defendant be sentenced to the same term that would be imposed if his |
| 6 | mental capacity [or -were *not* significantly reduced. The purpose of this departure is |
| 7 | lenity, not harshness, toward those who are mentally or emotionally disabled . . . . The |
| 8 | court's decision must be precise and fact-specific, and must take into account any |
| 9 | treatment the defendant is receiving or will receive while under sentence, the likelihood |
| 10 | that such treatment will prevent the defendant from committing further crimes, the |
| 11 | defendant's likely circumstances upon release from custody or its alternatives, the |
| 12 | defendant's overall record, and the nature and circumstances of the offense that brings |
| 13 | the defendant before the sentencing court. |

Cantu, at 1516 (citations and quotations omitted).

The salient federal sentencing factors do not favor imprisoning Sandhu. Rather, the sentencing factors favor placing Sandhu on probation for five years, with probation conditions that should ensure he does not commit further crimes. Furthermore, there is the likelihood that the counseling he will continue to receive will enable him to recognize his anger management problems and dissuade him from committing further crimes. Therefore, probation with appropriate probation conditions is sufficient but not greater than necessary to achieve the needs of the federal sentencing statute.

Dated: May 19, 2017

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge

9